IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| BRENT LEVORSEN, <br><br> Plaintiff, <br><br> v. <br><br> OCTAPHARMA PLASMA, INC., <br><br> Defendant. | AMENDED MEMORANDUM DECISION & RULING <br><br><br> Case No. 2:14-cv-325 <br><br> Magistrate Judge Dustin B. Pead |

The parties in this case have consented to United States Magistrate Judge Dustin Pead conducting all proceedings, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit (doc. 8).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Currently pending before the court is Defendant Octapharma Plasma Inc.'s ("Octapharma") motion to dismiss Plaintiff Brent Levorsen's ("Mr. Levorsen") complaint pursuant to federal rule of civil procedure 12(b)(6) (doc. 10).

On August 28, 2014, the court issued an order scheduling oral argument on Octapharma's motion and raising several issues for discussion at the hearing (doc. 19).  Thereafter, oral arguments were held on September 26, 2014.  Attorneys Lisa Yerkovich and Liesel Stevens were present on behalf of Octapharma, and attorneys Aaron Kinikini and Laura Boswell were present on behalf of Mr. Levorsen.  At the conclusion of the hearing, the court took Octapharma's motion under advisement.  Now, having considered the parties' arguments along with the relevant legal authorities, the court rules as stated herein.

## I. BACKGROUND

For purposes of Octapharma's motion to dismiss, the court accepts as true the facts set forth in Mr. Levorsen's complaint.

On May 6, 2013, as he had routinely done for several years prior, Mr. Levorsen attempted to donate source plasma at Octapharma's plasma donation center located at 5414 South 900 East in Salt Lake City, Utah.[1] As part of Octapharma's donor eligibility determination, Mr. Levorsen was required to undergo a physical examination during which he revealed that he was taking the medication Geodon for borderline schizophrenia disorder. Mr. Levorsen has psychiatric disabilities including borderline schizophrenia, post traumatic stress disorder, attention deficit hyperactivity disorder and insomnia and therefore qualifies as an individual with a disability under the Americans with Disabilities Act ("ADA").[2]

Based upon Mr. Levorsen's disclosure, Octapharma informed him that he would be unable to donate source plasma. The basis for refusal was Octapharma's assertion that during the donation process Mr. Levorsen might have a schizophrenic episode and "pull the needle collecting blood out of his arm and hurt him-self and/or others." (doc. 1, ¶16). As a result, Octapharma placed Mr. Levorsen's name on the "National Donor Deferral Registry" ("NDDR") thereby marking him as an individual unfit to donate and ensuring his inability to donate plasma at any donation center in the nation.

On May 23, 2013, Mr. Levorsen provided Octapharma with paperwork from his treating

---

[1]Source plasma is "the fluid portion of human blood collected by plasmapheresis and is used as a source material for further manufacturing use." (doc. 1, ¶10).

[2]The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102 (2)(A).

psychiatrist, Dr. Benjamin Thatcher, and from psychiatrist Dr. Christopher Davis.  Both doctors agreed that Mr. Levorsen was "medically suitable" to donate plasma two times per week (doc. 1, ¶19).  However, despite the psychiatrists' clearance, Octapharma informed Mr. Levorsen that because of his borderline schizophrenia disorder he would remain on the NDDR.

As a result of Octapharma's actions, Mr. Levorsen remains unable to donate source plasma and has been deprived of the $260.00 monthly income that his plasma donations previously provided (doc.1, ¶21).  On April 30, 2014, Mr. Levorsen filed his complaint against Octapharma alleging a variety of claims based on violations of Title III of the ADA and seeking both declaratory and injunctive relief (doc.1, ¶21).

## II.  LEGAL STANDARDS

Octapharma seeks dismissal of Mr. Levorsen's complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ.  P. 12(b)(6).  In considering a motion to dismiss under rule 12(b)(6), the court "accept[s] all well-pleaded facts as true and view[s] them in the light most favorable to the plaintiff."  *Jordan-Arapahoe, LLP v. Bd. Of County Comm'rs,* 633 F.3d 1022, 1025 (10th Cir. 2011).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S 544, 570 (2007)).

### III.  ANALYSIS

As enacted by Congress in 1990, the ADA was designed to remedy discrimination against disabled individuals.  *See* U.S.C. § 12101(a)(2), § 12101(a)(3).  The ADA constitutes remedial legislation and must be broadly interpreted in order to effectuate its purpose.  *See Steger v. Franco, Inc.,* 228 F.3d 889,894 (8th Cir. 2000) ("ADA is a remedial statute, and should be broadly construed to effectuate its purpose."); *Jensen v. United First Fin.,* 2009 U.S. Dist. LEXIS 117111; 22 Am. Disabilities Cas. (BNA) 1435, *20 (D. Utah Dec. 15, 2009).

Title III of the Act prohibits discrimination by private entities against a disabled individual or class of individuals in the operation of "places of public accommodation."  *See* 42 U.S.C. § § 12181-12189*; PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674-75, 121 S. Ct. 1879, 149 L.Ed. 2d 904 (2001).[3]

Specifically, Title III states:

> [n]o individual shall be discriminated against on the basis of
> disability in the full and equal enjoyment of the goods, services,
> facilities, privileges, advantages, or accommodations of any place
> of public accommodation by any person who owns, leases
> (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).  In this case, the parties agree that the only issue in dispute is whether Octapharma qualifies as a place of "public accommodation" under Title III.[4]  If this court

---

[3]The ADA also prohibits discrimination against disabled individuals in their employment (Title I), *see* 42 U.S.C. § § 12111-12117, and in public services (Title II), *see* 42 U.S.C. § § 12131-12165.

[4]In order to state a claim of discrimination under Title III of the ADA a plaintiff must allege: "(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2nd Cir. 2008); *see also* 42 U.S.C. § 1282(a); *Molski v M.J.*

determines that plasma donation centers are places of public accommodation, then Octapharma is bound by the mandates of the ADA and Mr. Levorsen must be allowed to participate on the same basis as other non-disabled persons. In the alternative, if Octapharma is found not to be a place of public accommodation, then it is exempt from Title III and may exclude any individual as it sees fit.

**A. Public Accommodation Under The ADA**

Under the broad interpretation policies of the ADA, the phrase "public accommodation" must be "construed liberally [in order] to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc.,* 532 U.S. at 675 (2001) (internal quotations omitted) (citing, S. Rep. No. 101-116, at 59; H. R. No. 101-485, pt. 2, at 100). Whether a facility constitutes a "public accommodation" is a question of law and therefore is a matter appropriate for resolution on a motion to dismiss. *See Jankey v. Twentieth Century Fox Film Corp.,* 14 F. Supp. 2d 1174, 1178 (C.D. Cal. 1998) *aff'd,* 212 F.3d 1159 (9th Cir. 2000).

The ADA defines the term "public accommodation" as one of the following entities:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment;
>
> © a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

---

*Cable, Inc.,* 481 F.3d 724, 730 (9th Cir. 2007)*; Powell v. Nat'l Bd. Of Med. Exam'rs,* 264 F.3d 79, 85 (2nd Cir. 2004); *Stan v. Wal-Mart Stores, Inc.,* 111 F. Supp. 2d 119, 124 (N.D.N.Y. 2000).

  (D)  an auditorium, convention center, lecture hall, or other place of public gathering;

  (E)  a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

  (F)  a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

  (G)  a terminal, depot, or other station used for specified public transportation;

  (H)  a museum, library, gallery, or other place of public display or collection;

  (I)  a park, zoo, amusement park, or other place of recreation;

  (J)  a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

  (K)  a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

  (L)  a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).   Plasma donation centers are not listed under any of the twelve defined categories of public accommodations.

  Despite the fact that plasma donation centers are not explicitly listed, Mr. Levorsen asserts that they fit within:  (1) the catch-all provision of "other service establishment" as listed under subsection (F); or, in the alternative, (2) a "professional office of a health care provider" a

category also listed under subsection (F).⁵  The court examines each of these provisions in turn.⁶

1. Service Establishment

Mr. Levorsen acknowledges that plasma donation centers are not explicitly listed under subsection (F), but asserts that they "fit comfortably" within the "other service establishment" provision of the subsection.  42 U.S.C. § 12181(7); *see PGA Tour, Inc.,* 532 U.S. at 677 (2001). In support of his claim, Mr. Levorsen relies upon the ADA's Implementing Regulations which provide that "while the list of categories is exhaustive, the representative examples of facilities within each category are not." *Nondiscrimination On The Basis Of Disability By Public Accommodations And In Commercial Facilities,* 28 C.F.R., Part 36, app. B at 211 (2010).  In response, Octapharma counters that there is no language which would permit the term public accommodation to be "stretched outside of the specifically listed categories" and for the court to do so here would be inappropriate (doc. 10, p. 7).  *See Jankey v. Twentieth Century Fox Film*

---

⁵The court and the parties were unable to find any published case involving this exact issue and accordingly the court considers the issue to be one of first impression.

⁶At oral argument, the court raised the issue of whether Mr. Levorsen was actually challenging his *placement* on the NDRR list as opposed to challenging his *access* to the plasma donation center as a place of public accommodation.  The court's inquiry was based upon the District Court's holding in *Elitt v. U.S.A. Hockey,* 922 F. Supp 217 (E. D. Mo. 1996), where the Missouri District Court determined that "it lacked jurisdiction over a cognitively disabled child's Title III claim against  U.S. amateur hockey organization because plaintiff was challenging the 'denial of participation in the youth hockey league instead of denial of access to a place of accommodation, i.e. the ice rink.'" *Shepard v. United States Olympic Comm.,* 464 F. Supp. 2d 1072, 1084 (Dist. Colo. 2006) (citing *Elitt*, 922 F. Supp at 223)).
   Here, the court analogized Mr. Levorsen's placement on the NDRR list with *Elitt's* participation in a youth hockey league.  Mr. Levorsen, however, effectively argued that his placement on the NDRR list was not a jurisdictional hurdle to his claims since placement on the NDRR list was only incidental to a larger, more generalized access issue.  Additionally, Mr. Levorsen confirmed that his claims, as set forth in his complaint, are solely based upon access to Octapharma's plasma donation center as a place of public accommodation and not upon his "membership" or placement on the NDRR list.

*Corp.,* 14 F. Supp. 2d 1174, 1178 (C.D. Cal. 1998) ("[t]he ADA includes an exhaustive, not merely exemplary or illustrative, list of private entities which are nevertheless considered 'public accommodations.'").

While acknowledging the comprehensive policies behind the ADA, the court is unable to conclude that plasma donation centers "fit comfortably" within the "other service establishment" provision of 42 U.S.C. § 12181(7) and, as a result, declines to include them within its ambit. While the court agrees that the public accommodations set forth under subsection (F) are illustrative and that the term "other service establishment" is inexact, a consideration of the facilities explicitly listed reveals a similarity between each– an establishment, in return for payment, provides a service to a member of the public. *See* 42 U.S.C. § 12181(7) (F). By way of example, an individual drives to a gas station, an establishment explicitly listed under subsection (F), in order to obtain gas for her car. *Id.* At the station, the individual provides payment to the attendant and, in return for that payment, the individual is allowed to fill her vehicle's tank with gasoline. Similarly, an individual visits a laundromat, an establishment also listed under subsection (F), seeking to clean his clothes. *Id.* As a service establishment, the laundromat agrees to provide the use of its washers and dryers in exchange for payment from the individual. Thus, in both of theses examples, as in all establishments listed under subsection (F), a common theme is the provision of goods or services to the public, in exchange for money.

A plasma donation center is distinguishable. Unlike the other service establishments explicitly listed, a plasma donation center does not offer goods or services in exchange for compensation. To the contrary, it is the plasma donation center that offers money to a member of the public in exchange for a service to the center—the donation of plasma. Once obtained from

the public, the plasma is then sold by the plasma donation center to a drug manufacturer for a profit.[7]  Unlike the service establishments set forth under subsection (F), Octapharma does not provide a service to the public but instead pays members of the public, such as Mr. Levorsen, for their donation of plasma to the center.  *See Maley v. Octapharma Inc.,* No 12-13892, 2013 WL 3814248 (E.D. Mich. July 22, 2013) (unpublished) ("A plasma donation center is not listed as a covered entity [under 42 U.S.C. § 12181(7)] and does not provide a 'service' to the public.")

Applying the service-provider distinction, Mr. Levorsen's argument in favor of a liberal interpretation is tempered by principles of statutory construction which require consideration of the term "plasma donation center" and "other service establishment" as consistent with those entities already listed under subsection (F).  *See Phibbs v. American Property Management,* 2008 U.S. Dist. LEXIS 21879 *7 (D. Utah Mar. 19, 2008) (affirmed 60 Fed. Appx. 738, 2003 U.S. App. LEXIS 5478 (10th Cir. Utah 2003) (interpreting term "other place of lodging" consistent with the other public accommodations listed under subsection (A)).  Considering plasma donation centers consistent with the other service establishments listed, the court concludes that the service-provider distinction creates a fundamental difference between plasma donation centers and the other establishments listed that prohibits the incorporation of plasma donation centers under a the "other service establishment" provision of  42 U.S.C. § 12181(7) (F).

**2. Health Care Provider**

In the alternative, Mr. Levorsen argues that a broad reading of the ADA supports an

---

[7] Consideration of plasma donation centers as entities that provide a step in the blood manufacturing process, as opposed to establishments that provide a service to the public, is further supported by federal regulations characterizing blood collection as a step in the "manufacturing of [s]ource [p]lasma".  *See* 21 C.F.R. § 640.71(a) (statute outlining the responsibilities of manufacturers involved in the source plasma manufacturing process).

interpretation of a plasma donation center as a "professional office of a health care provider"—a covered entity listed under subsection (F). *See* 42 U.S.C. § 12181(7) (F).

In support of his claim, Mr. Levorsen asks the court to define the term "health care provider" under the ADA consistent with the term as set forth under various other federal and state statutes and regulations. *See* 42 U.S.C. § 300jj(3) (2009) (defining term "health care provider as including "blood center"); 42 U.S.C. § 1320b-5 (defining the term "health care provider" under the Social Security Act's provision entitled "Authority to waive requirements during national emergencies" as "any entity that furnishes health care items or services, and includes a hospital or other provider of services, a physician or other health care practitioner or professional, a health care facility, or a supplier of health care items or services."); 42 U.S.C. § 1395x(s) (2)(A) (2012) (citing to definitions listed under the Social Security Act's Title on "Health Insurance For The Aged And Disabled" and noting that the term "medical and other health services" includes "services and supplies (including drugs and biologicals which are not usually self administered by the patient); 21 C.F.R. § 606.3 (d)-(e) (2008) (under Title 21 Food and Drugs, noting that blood and plasma are defined as biologicals under Subchapter F "Biologics"). Considered collectively, Mr. Levorsen argues that these various statutes and regulations compel the conclusion that "Congress intended blood centers and plasma donation centers to be considered 'health care providers'" (doc. 15, p.15).[8]

---

[8]Mr. Levorsen also asserts that Utah state law supports an interpretation of plasma donations centers as health care providers. *See* Utah Code Ann. § 78B-3-402(12) (defining health care provider in the context of the Utah Health Care Malpractice Act as an facility that renders health care); Utah Code Ann. § 26-31-201(1) (characterizing the "procurement, processing, distribution, or use of a blood product for the purpose of injecting or transfusing the blood product into the human body" as a service and not a sale under the Utah Health Code); Utah Code Ann. § 26-31-102(2)(b) (defining "blood product" under the Utah Health Code to

In response, Octapharma challenges the applicability of the statutes cited and argues that the only federal authority directly on point specifically states that plasma donation centers do not provide health care services.  *See* Standards for Privacy of Individually Identifiable Health Information, 60 Fed. Reg. 82,574 (Dec. 28, 2000) (indicating that plasma donation centers are exempt from the Health Insurance Portability and Accountability Act "HIPAA" because they do not provide "health care services" to "patients").

As an initial matter, the same service-provider reasoning relied upon by the court to conclude that plasma donation centers do not qualify as "other service establishments" also applies here and precludes the inclusion of a plasma donation center as a "professional office of a health care provider."  Consistent with the other establishments listed under subsection (F), a health care provider provides a service to the public in return for compensation.  To the contrary, plasma donation centers do not provide a health care service to the public, but instead are involved in the manufacturing of plasma for profit.

Further, the court has reviewed the federal and state statutory provisions referenced by Mr. Levorsen  and is convinced that the definition of "health care provider" must be viewed in the unique context in which it is presented.  Specifically, the provisions cited apply to the definition of "health care provider" under unique and varied provisions of the Public Health and Welfare Code pertaining to Health Information Technology and Quality, the Social Security Act, the Social Security Act's Title on Health Insurance for the Aged and Disabled, the Utah Health Care Malpractice Act and the Utah Health Code.  Thus, while informative, none of the definitions reference plasma donation centers and there is no evidence that Congress intended these

---

include "blood plasma").

definitions of "health care provider", as defined under unrelated federal and state statutes and regulations, to apply and assist in defining the term as set forth under the ADA.[9]

**B. Policy Considerations**

This case challenges the court to separate the emotional appeal of Mr. Levorsen's arguments from the legal appeal of his claim under the ADA. The emotional appeal of the claim requires reconciling the seeming lack of proportionality between Octapharma's safety concerns, which never manifested (and based upon Mr. Levorsen's doctor's evaluations were unlikely to ever do so), and the wholesale exclusion of Mr. Levorsen from the plasma donation process.

Additionally, the court notes the striking absence of any similar accommodations explicitly listed under § 12181(7) that, like plasma donation, involve and facilitate an individual's donation of a biological material examples of which include blood donation, sperm donation, egg donation, bone marrow donation and stem cell donation. These industries and establishments supporting biological material donation encompass technology and concepts that appear to approach the peripheries of the term "public accommodation."

Ultimately, however, the court recognizes that its rulings are guided by the state of the law as it stands and that the wholesale inclusion of the plasma donation industry, within the confines of the categories set forth under 42 U.S.C. § 12181(7), would be a question most appropriately

---

[9]Similarly, the court finds Mr. Levorsen's reliance upon the case of *Smith v. Paslode Corp.* to be misplaced. 7 F.3d 116 (8th Cir. 1993). While the Eigth Circuit held that the Red Cross was an entity and that "the procurement, processing, distribution, or use of whole blood, plasma, blood products and blood derivatives from transfusion into the human body is a service," that holding was specifically based upon a Missouri state statute that has no application to the ADA. *Id.* at 117; Missouri State. Ann. § 431.069. Further, the facts in *Smith* involved the supply of blood products by the Red Cross for transfusion purposes and are therefore distinguishable from the circumstances surrounding Octapharma and the manufacturing of plasma for profit.

directed to the United States Congress.

## IV.  CONCLUSION

Based hereon, the court concludes that Octapharma, a plasma donation center, does not qualify as a place of public accommodation as contemplated under the ADA and therefore Octapharma is not subject to 42 U.S.C. § 12182.

Accordingly, Octapharma's Motion To Dismiss is hereby GRANTED (doc. 10).

**IT IS SO ORDERED.**

DATED this 1st day of December, 2014.

BY THE COURT:

_____
Dustin Pead
U.S. Federal Magistrate Judge